Lorraine GRUHALLA, (Plaintiff) Respondent,

v.

GEORGE MOELLER CONSTRUCTION COMPANY, a Corporation, and Reverend Vincent Naes, (Defendants) Appellants.

Nos. 31537, 31538.

St. Louis Court of Appeals.

Missouri.

April 20, 1965.

Motion for Rehearing or for Transfer to Supreme Court Denied May 14, 1965.

Application to Transfer Denied July 12, 1965.

W. Munro Roberts, Jr., Theodore D. Ponfil, Heneghan, Roberts & Cole, St. Louis, for appellant George Moeller Const. Co.

John S. Marsalek, Robert E. Keaney, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant Rev. Vincent Naes.

James F. Koester, St. Louis, David G. Dempsey, Clayton, for respondent Lorraine Gruhalla.

RUDDY, Presiding Judge.

This is an action for damages for personal injuries sustained by plaintiff when she tripped in a depressed or recessed area and fell while leaving St. Cecelia's Catholic School. Plaintiff recovered a judgment for $8850 against both defendants, namely, Reverend Vincent Naes and George Moeller Construction Company, a corporation. Defendants' motions for judgment were overruled but their motions for a new trial were sustained and the court set the judgment aside. Thereafter, the court entered an order setting aside the prior order granting a new trial and entered an order over-

ruling defendants' motions for directed verdict or in the alternative for a new trial.

In her amended petition plaintiff alleged that the defendant George Moeller Construction Company was engaged in the construction of St. Cecelia's Catholic School in the City of St. Louis; that the construction of said building had been commenced and that said defendant was the agent, servant and employee of defendant, Reverend Vincent Naes; that on November 12, 1959, when said building had not as yet been completed plaintiff was on the premises of said school as a business invitee for the purpose of attending a meeting and while on said premises was using a vestibule or exit way from said school; that the interior of said vestibule was dark and dingy and contained therein a hole or opening in the floor of the said vestibule or exit way and that plaintiff was thereby caused to fall upon the said hole or opening in the said floor and was caused to sustain great physical injury. The negligence alleged in said amended petition was that said defendants maintained said vestibule or exit way in a condition that was dangerous and not reasonably safe; that they failed and omitted to eliminate or correct the dangerous condition.

Plaintiff further alleged that defendants were negligent in allowing the public to use said place which was dark, dingy and not reasonably safe; in failing to provide illumination at or near said exit way or vestibule and in failing to warn her of said condition.

Plaintiff further alleged that defendants in the exercise of ordinary care could have provided a barrier, guard rail or other type of protection in the area of the hole or opening in the said floor and thus and thereby have avoided said fall and injury to the plaintiff.

We shall refer to Reverend Vincent Naes as Father Naes and to George Moeller Construction Company as Moeller. The only evidence offered on the part of the defendants was the reading of parts of the building contract which will be referred to later. All other evidence was offered by plaintiff during her case.

The entire property belonging to St. Cecelia's Catholic Church occupies an entire city block bounded on the north by Eichelberger Avenue, on the south by Eiler Avenue, on the west by Louisiana Avenue and on the east by Alaska Avenue.

The Archbishop of the City of St. Louis holds the legal title to the property. The church building is located at the southeast corner of the block and the rectory at the southwest corner. Prior to June 1958 the old school was located on the corner of Louisiana and Eichelberger. Father Naes was Pastor of the parish under appointment by the Archbishop and had supervision and control of the church, school and parish.

In the summer of 1958, the construction of a new school and auditorium, sometimes referred to in the testimony as gymnasium, was commenced on the northeast corner of the city block, namely, Eichelberger and Alaska. A contract for the erection of the building was made with Moeller and was signed by the Archbishop and Father Naes. While the new school was being constructed the children attended the old school. During the summer of 1959, the old school was torn down. In September of 1959, the children started to attend the new school.

The new building consisted of a ground floor which was even with the sidewalk and two stories above the ground floor. There were a number of entrances to the school building, but the one involved in plaintiff's accident faced Eichelberger Avenue to the north. It consisted of two glass doors and on each side of the glass doors were narrow fixed glass panels. Father Naes testified that the area of glass in the doors and panels was 72 square feet, and in the vestibule inside of the entrance doors were three lights which could be turned on by use of a three way switch. The doors entered into a vestibule, and from the doors to two steps which ascended to a hallway was a distance

of six feet from north to south. This hallway led to a room referred to in the testimony as the Youth Room. In the vestibule there was a recessed area in the floor, approximately four by eight feet in size, which was designed to hold a rubber mat. Plaintiff estimated the depth of the recessed area at one to one and one-half inches. Father Naes testified that the depth by actual measurement was one-half inch. He also testified that the recessed area was constructed in conformance with the building contract. Father Naes further testified that there were a lot of items considered furnishings which were excluded from the building contract and were to be furnished by the parish. Included in the items considered furnishings were the rubber mats which were to be furnished by the parish and included in them was the rubber mat for the recessed area in question. Father Naes testified that approximately one year before the mat was needed he ordered it from a supply house. He further testified that when the contractor had finished with that area of the building, a mat was delivered but was found to be of an incorrect size. This mat was taken back by the company that furnished it and the salesman for said company measured the space again and between that time and the time of plaintiff's injury Father Naes had asked the mat supply company for delivery of the mat many times without success.

At the time plaintiff fell there was no rubber mat in the recessed area at the bottom of the stairs. There were no ropes or barricades preventing the use of the exit way and there were no signs warning of the depression. When plaintiff came out of the Youth Room where the meeting was held the day of her fall, there were no lights in the hall. However, she said she had no difficulty seeing the steps as she approached the exit way. There was no artificial lighting in the vestibule at the exit door but plaintiff testified that there was sufficient light coming in through the glass door for her to have good vision.

Father Naes testified that there was no attempt to place anything in the recessed area in lieu of the mat, further testifying that the area is well lighted by means of the glass panel and the glass door. He said that some time between the opening date of school and the time of plaintiff's fall he told Mr. Fred Ruck, foreman for Moeller, he felt that the recessed area was dangerous and that he thought something should be placed in the area in question.

Plaintiff alleged in her petition that defendant Moeller was the agent, servant and employee of defendant, Father Naes, in the construction of said school building and that on the occasion of plaintiff's fall the construction of said building had not as yet been completed. Parts of the building contract for the construction of the school and gymnasium were read into evidence and the pertinent parts relative to the time the construction of the school and gymnasium was to be completed for occupany were as follows: "The school and gymnasium shall be completed for occupancy by April 1, 1959, the balance of the work shall be completed by July 1, 1959." Another provision under the general specifications in said contract provided that the owner will have the right to take possession of and use any completed or partially completed portions of the structure or work notwithstanding the time for completing the entire work may not have expired. At the time of his testimony Father Naes said he was not familiar with the latter provision of the contract. In this connection plaintiff testified: "Q. But the school itself and the entrance way or exit way where you were leaving the building that day had been fully constructed and in use for a period of some two months, is that not correct? A. Possibly."

Father Naes testified that some time prior to the opening of the school season he asked the contractor whether he could get in the building and thereafter he gave the "go ahead" for the school to be used by the students. He did not relate the conversation he had with the contractor. Father

Naes testified to the preparation of a check list, evidently prepared by him and the contractor, Moeller, for the completion of little items in the building. Some of these items on the check list were not completed and were still to be performed at the time of plaintiff's fall. He was asked, "And you have no recollection whatsoever of any items being on the check list in this exit area, there was nothing to be done in there?" He answered, "I cannot recall the check list."

When the court asked Father Naes whether the workmen for the construction company were still performing tasks in the actual area itself within the school, "that is the area where the action occurred," he answered "Your Honor, I could not say whether they were specifically in that area doing anything of the check list that date." However, he did testify that with reference to the items on the check list, that Moeller had not completed the check list at the date of the accident and that some of the items were completed after the accident. There was no further testimony as to whether or not any of the items on the check list concerned the vestibule and the recessed area.

Plaintiff was a member of the St. Cecelia's Parish at the time of the accident and had been for approximately four years. During that time she had attended church and had been on the property belonging to the parish. Plaintiff has a child who was attending the parish school and who had attended the old school before it was torn down and thereafter attended the new school. Plaintiff testified that she was active in the Council of Catholic Women and attended their meetings which were held in the school building. She was a co-leader in a group of girls known as the Brownies. This group consisted of girls eight to eleven years of age. She said that the Brownie organization operated under the auspices of the Girl Scouts of America. Prior to the meeting held at the time of plaintiff's accident, the Brownie group had always met at someone's home.

Plaintiff was asked by the court: "Now, do Brownie troops have organization sponsors like the Boy Scouts and Girl Scouts do?" and she answered, "I don't know." The court again asked, "Do you know of your own knowledge whether or not this particular Brownie Troop had a sponsor or an organization sponsor, a church or school or anything of that nature" and she answered, "No, I really don't." Each child in this Brownie group was a member of St. Cecelia's Parish. Plaintiff had been active in the Brownie group for one year prior to her accident. She said that the Brownie group always began their meetings and ended the meetings with Catholic prayers.

On the date of plaintiff's accident, namely, November 12, 1959, the Brownie group held a meeting in the new school. Plaintiff said this was the first Brownie meeting held in the new school and said that the purpose of the meeting was to practice for the children's one year celebration and the holding of their regular Brownie meeting. In connection with the purpose of the meeting plaintiff gave the following testimony: "Q. You were not attending any religious service at the time? A. No, sir." She said she was just attending a Brownie meeting and there was no other purpose in being there other than "we were practicing for their one year celebration, which was going to be held there. Q. That was the sole purpose of being there? A. That's right. Q. This is not a function directly connected with the school? A. No." She said the nuns who operate the school had no control, function or connection with the Brownie meeting. She further testified: "Q. There was no business connection of any kind, was there, between this meeting and Father Naes? A. No." She said that Mrs. Ghiglione who was the leader of the Brownie group informed her that the meeting was to be held in the school on that particular afternoon. When asked if Father Naes had any control over the Brownie organization and whether he ever attended any meeting or collected any money she answered, "I wouldn't know." She was not personally

aware of what arrangements had been made whereby the Brownie group was permitted to use the Youth Room and she did not know whether there was any payment made to Father Naes for use of the room. She could not say whether or not Father Naes had given permission to use the Youth Room.

Plaintiff further testified that she arrived for the meeting about 3:25 P.M. and left at about 4:45 P.M., at which time it was "beginning to get dark." There were no artificial lights lit at the exit way leading onto Eichelberger Avenue. She had never used this particular exit way before, stating that she came in the entrance door facing Alaska Avenue. As stated before, she testified that there was sufficient light coming in the exit door and panels to provide good vision. When leaving the meeting room she walked down the hall toward the Eichelberger entrance with the children around her, ahead of her and to her side, together with some other adults who had attended the meeting. As she was descending the steps, heretofore described, she did not recall looking down but said she was looking ahead. She said she was unable to see the landing at the bottom of the steps, obviously meaning the vestibule floor, and as she proceeded toward the exit door her foot struck something which caused her to fall forward and out of the exit door, landing on her right elbow outside of the building. We have left out some of the testimony she gave concerning her approach to the door and concerning her fall for a reason that will become obvious. When she reached the landing at the bottom of the steps she did not know that she was in the recessed area and she did not know this until her "left foot hit something, an extension or something, whatever that, abutment, or whatever it was that stuck up." She said that at the time she fell she did not know precisely what caused her to fall until later when she went back into the building.

Father Naes testified that some years previous to the day of the accident he had given permission to the Brownie group to meet in the school. He said that no specific permission had been given by him for the particular meeting, after which the accident occurred, but added, that it "probably was included in a general permission given for them to meet." He said that all of the members of the Brownie group were members of his parish. Father Naes said that he was the pastor of the parish, including the church and school and that the whole school and parish were under his supervision and control. He said the Brownie organization paid nothing to him or to the parish for the use of the school facilities. When asked "Did you exercise any supervision, control or direction over the operation of the Brownie group?" he answered, "No more than permission that they could use the premises, perhaps specifying the time." He said that he had no business connection or any business function with the Brownie group on November 12, 1959. He said that some 10 or 12 organizations in the parish used the Youth Room or the gymnasium or other facilities of the school and parish and that it is all done with his permission. Some of the organizations permitted to use the aforesaid facilities contribute money to the parish and some of them raise funds for the school, but that the Brownies do not contribute any funds to the parish. When Father Naes was asked if the Brownies were beneficial to the church and school and to him as Pastor, he said, "Beneficial in the sense that these ladies who take care of the Brownies are following the Brownie rule which is beneficial for society in general, including a Catholic parish."

Both defendants assert many specifications of error by the trial court but the primary one among the points relied on is the contention by both defendants that the trial court erred in overruling their motions for a directed verdict at the close of the entire case and their after trial

motions for judgment. In this connection they assert that there was no evidence that plaintiff was a business invitee of Father Naes as she alleged. It is their contention that the evidence disclosed, without controversy, that plaintiff's status at the time of her injury was that of licensee, using the school building gratuitously, and not for any purpose of real interest and benefit to Father Naes. Both defendants allege that under such circumstances plaintiff was not entitled to recover.

Our first discussion will be with respect to the relationship existing between the plaintiff and Father Naes and what care and duty he owed the plaintiff. Of course, a determination of this relationship must be found in a perusal and an analysis of the facts as heretofore outlined.

▆▆▆ The decisive question presented in this point, according to the authorities hereinafter cited, is whether plaintiff was there for her own purpose or for some purpose of real benefit or interest to Father Naes. Twine v. Norris Grain Co., Mo. App., 226 S.W.2d 415, 1. c. 422. In determining this question we feel that it can be assumed that plaintiff was on the school premises with the permission and implied consent of Father Naes. Plaintiff has the burden of showing that her presence on the premises would result in some real benefit to Father Naes. Argus v. Michler, Mo.App., 349 S.W.2d 389, 1. c. 394, 93 A.L. R.2d 776.

Plaintiff's theory of recovery at the trial can be found in her petition and instructions. In her petition she alleged that "plaintiff was on the premises at St. Cecelia's School as a business invitee for the purpose of attending a meeting." And in her instructions she hypothesized facts which, if found by the jury to exist, imposed upon the defendants the duty owed an invitee by an invitor as an occupier or possessor of property.

▆▆▆ No claim was made below, nor is any now asserted, that defendants' neg-

ligence was of that degree that would render them liable to plaintiff if she was a mere licensee. ("* * * wantonness, or some form of intentional wrong or active negligence * * *"), Argus v. Michler, supra, (349 S.W.2d 1. c. 390); Stevenson v. Kansas City Southern Ry. Co., 348 Mo. 1216, 159 S.W.2d 260, 261(1). A bare licensee (barring wantonness, or some form of intentional wrong or active negligence by the owner or occupier) takes the premises as she finds them. Wolfson v. Chelist, Mo., 284 S.W.2d 447; Mo.App., 278 S.W. 2d 39, 45, 47; Twine v. Norris Grain. Co., supra, 226 S.W.2d 1. c. 420. But, as said in Argus v. Michler, supra, (349 S.W.2d 1. c. 392) quoting from Glaser v. Rothschild, 106 Mo.App. 418, 80 S.W. 332, 221 Mo. 180, 120 S.W. 1, 22 L.R.A.N.S. 1045, as to a business visitor: " 'the situation, with reference to liability, radically changes when the owner invites the use of his premises for purposes connected with his own benefit, pleasure, and convenience. * * *' in which event the occupier's duty is to use ordinary care to prevent injury."

▆▆▆ While we have said that it can be assumed that plaintiff was on the school premises with the permission and implied consent of Father Naes, the mere fact of such an implied invitation alone is not sufficient to make one an invitee in the legal sense. Mere permission without more involves "leave and license," but bestows no right to the care due an invitee. Glaser v. Rothschild, supra, 221 Mo. 1. c. 185, 120 S.W. 1; Stevenson v. Kansas City Southern Ry. Co., supra; Twine v. Norris Grain Co., supra, 226 S.W.2d 1. c. 420; Kalinowski et ux. v. Young Women's Christian Association, 17 Wash.2d 380, 135 P.2d 852; McNulty v. Hurley, Fla., 97 So.2d 185; Glaser v. Congregation Kehillath Israel, 263 Mass. 435, 161 N.E. 619.

In Wolfson v. Chelist, Mo., 284 S.W.2d 447, 1. c. 450, the court said:

"The word 'invitation' here has been a source of difficulty because of an ap-

parent incongruity in terminology inasmuch as the 'invited' social guest is held to be not an invitee but a licensee. We have here an invitee who is not an invitee. The incongruity, only apparent, disappears, however, when it is understood it has been thought there must be something more than the mere fact of an invitation to give the entrant upon another's property the status of an invitee in a legal sense. Having an invitation, we are concerned with what kind of an invitation it is. What are its terms? To what place are we invited? For what purpose are we asked to come there?"

In the case of Glaser v. Rothschild, supra, 221 Mo., l. c. 184–185, 120 S.W. 1, the general rule is stated that the owner or occupier of the premises lies under no duty to protect those from injury who go upon the premises as volunteers or merely with his express or tacit permission from motives of curiosity or private convenience in no way connected with business or other relations with the owner or occupier. Such persons are mere licensees. Porchey v. Kelling, 353 Mo. 1034, 185 S.W.2d 820; Stevenson v. Kansas City Southern Ry. Co., supra; Argus v. Michler, supra; Connole v. Floyd Plant Food Co., Mo.App., 96 S.W.2d 655; Roe v. St. Louis Independent Packing Co., 203 Mo.App. 11, 217 S.W. 335; McNulty v. Hurley, supra; Comeau v. Comeau, 285 Mass. 578, 189 N.E. 588, 92 A.L.R. 1002; Glaser v. Congregation Kehillath Israel, supra; Prosser on Torts, 3rd Ed. p. 385.

But, as pointed out in the Glaser case, and as we quoted heretofore, the situation with reference to liability changes when the owner invites the use of his premises for purposes connected with his own benefit, pleasure and convenience.

Simply and concisely stated, an invitee in the legal sense is one who is invited into the premises of the owner or occupier for some purpose connected with the business in which the owner or occupant of the premises is then engaged or for any other purpose beneficial to the owner or occupant. To establish such relationship (of invitee and invitor) there must be some real benefit to the invitor or mutuality of benefit or interest in the subject to which the invitee s business or purpose relates. Wolfson v. Chelist, Mo., 284 S.W.2d 447; Porchey v. Kelling, supra; Stevenson v. Kansas City Southern Ry. Co., supra; Argus v. Michler, supra; Twine v. Norris Grain Co., supra; Connole v. Floyd Plant Food Co., supra; Roe v. St. Louis Independent Packing Co., supra; DeMello v. St. Thomas The Apostle Church Corp., 91 R.I. 476, 165 A.2d 500; Kalinowski et ux. v. Young Women's Christian Assn., supra; Prosser on Torts, 3rd Ed. pp. 394–395.

As heretofore stated, it is the purpose for which a person visits the premises of another which determines whether he is an invitee or a licensee. Therefore, we examine the evidence to determine what purpose plaintiff had in visiting the school building on the occasion of her accident. Plaintiff visited the school building for the purpose of attending the meeting of the Brownie group which was the first Brownie meeting held in the new school. Prior to this meeting it seemed that the Brownie meetings had been held in the homes of the members of the group. Plaintiff had a child who was a member of the Brownie group and there is no doubt that the activities of the plaintiff as a co-leader in the Brownie organization were for the purpose of assisting her young daughter in acquiring practices of discipline and good citizenship. We say this because the evidence shows that the Brownie organization operated under the auspices of the Girl Scouts of America, an excellent and fine organization devoted to teaching young girls their obligations to country and fellow man.

Plaintiff attended this meeting in the new school for the sole purpose, and no other, to practice for "their one year celebration,"

as she put it, and in addition to hold their regular Brownie meeting. She said that she was not attending a religious service at the time; that the meeting was not a religious service and that there was no other purpose in being there at the time in question, except to practice for their one year celebration and to hold the regular Brownie meeting. She admitted that this was not a function directly connected with the school and expressly said that the meeting had no business connection of any kind with Father Naes and that neither he nor the nuns of the school had any control, function or connection with the meeting. The evidence shows that Father Naes exercised no supervision or control over the Brownie organization. While she testified that the Brownie group always began the meetings and ended the meetings with Catholic prayers, there is nothing in the evidence to show that this practice was urged by Father Naes or that he attempted to control it in any manner. There is no evidence to show that Father Naes ever attended any of the meetings of the Brownie organization. No payment of any kind was ever made by the Brownie group to Father Naes or to the parish for the use of the school. In this connection plaintiff did not know what arrangements had been made by the Brownie group to use the Youth Room for their meeting. The only thing she seemed to know was that she was told of the meeting place by Mrs. Ghiglione, the leader of the group. Plaintiff did not know whether the Brownie group had a sponsor, such as a church or school or anything of that nature and there was nothing to show that the St. Cecelia Parish or Father Naes in any way sponsored the Brownie organization.

The testimony of Father Naes, given in plaintiff's case, shows that he had no business connection or any business function with the Brownie group and that he did not sponsor it or exercise any control or supervision over the organization. He did admit giving the organization permission to use the Youth Room for their meetings for which they paid nothing. When asked if the organization was beneficial to him and to the church and school, he said, it was in the sense that the ladies who take care of the Brownies are following the Brownie rule which is beneficial to society in general and, therefore, to his Catholic parish.

We find nothing in the evidence in this case to show that plaintiff was a business invitee on the school premises on the occasion of her accident. This was admitted by plaintiff and it is clear that the Brownie meeting did not perform a business function, as the term is understood, and was completely without a business purpose. Further, we feel that the evidence fails to show that the purpose of plaintiff's visit to the school premises on the day of her accident was beneficial to Father Naes and failed to show that any real benefit within the contemplation of the law of invitee and invitor was conferred upon Father Naes on this occasion.

In the case of Argus v. Michler, supra, the defendant admitted that one of the reasons he maintained a telephone in his filling station premises was because someone might come in and use it and end up buying a set of tires. We said that the mere possibility someone using this telephone, maintained by defendant for convenience of his customers, might buy something was too speculative to constitute a real benefit to the defendant and we held that the plaintiff was not a business invitee of the defendant.

A case somewhat analogous to the instant case is Roe v. St. Louis Independent Packing Co., supra. In that case plaintiff, a 15 year old boy, was a member of the Y.M.C.A., and as such, was a member of an observation class, the purpose of which was the instruction of the said boys by taking them to visit various manufacturing plants in the City of St. Louis, and thus enable them to see various processes of manufacture carried on. The instructor of the class wrote to the general manager of defendant asking permission to bring a

group of boys through defendant's plant. The general manager of defendant replied by letter that it would be entirely satisfactory. On their visit the defendant furnished them with an employee to show them through the different departments. After being shown the slaughtering process, the boys were taken to the ice manufacturing plant operated by the defendant and while there plaintiff fell into a tank of hot water and was severely burned. The crucial question in the case was whether or not the plaintiff was a bare licensee or invitee. The trend of plaintiff's argument in support of his contention that he was an invitee was that the advertising of one's business is the best means of increasing business; that a recognized practical method of advertising, and one of the best means for increasing business is to get the general public to visit the mercantile or manufacturing plant for the purpose of acquainting them with the modern hygienic system of conducting same, as well as familiarizing the visitor with each department and the operation thereof; that the boys themselves who visited the plant some day may be customers but, in addition, that they will talk among their friends and sound the praises of the things that impressed them as they went through the various establishments which they visited.

In rejecting this argument the court pointed out that the sole object of the visit was the instruction of the boys and held: "In light of the undisputed testimony in this case it is clear to us that plaintiff must be regarded as a bare licensee, and not as an invitee." (217 S.W. 1. c. 337).

As pointed out by defendant, Father Naes, the education of the boys in the Roe case was of benefit to the general public and thus directly and remotely to the defendant. Similarly, in the instant case plaintiff's visit may have benefited society in general but such benefit was too remote to constitute a real benefit to Father Naes.

For other factual situations wherein the court found no real benefit or interest to the defendant, see Twine v. Norris Grain Co., supra; Connole v. Floyd Plant Food Co., supra.

Plaintiff contends that the evidence in this case shows that she entered the school premises with the permission of Father Naes and that she did not enter out of any motive of curiosity or private convenience unconnected with her relationship to Father Naes in the parish. Thus, she said, she was not a mere licensee but an invitee.

As we have pointed out, the rule is otherwise. The authorities cited hold that mere permission without more bestows no right to the care due an invitee. As said in the case of Wolfson v. Chelist, supra, there must be something more than the mere fact of an invitation to give the entrant upon another's property the status of an invitee in a legal sense. The cases all hold that there must be some real benefit to the invitor.

Plaintiff next contends that she did not enter the school for her own benefit but as a volunteer leader or teacher of the Brownie troop in the parish. She says the parish has both spiritual and secular objectives and as co-leader of the Brownie troop she was promoting the secular, if not the spiritual objectives, of the parish in developing practical skills and good traits of character. From this she concludes that there was a direct benefit to Father Naes in her visit to the school. This contention fails to find support in the evidence. The Brownie group was not sponsored by the parish or by Father Naes. This was admitted by plaintiff in her testimony. She says that, in fact, her presence did benefit the "unworldly business" of the school and, therefore, was of benefit to Father Naes. We have pointed out that it was the burden of plaintiff to show that her presence on the premises would result in some real benefit to Father Naes. This, we rule, she has failed to do.

In support of this contention plaintiff cites a number of cases from other juris-

dictions. We have examined these cases carefully and find they do not support plaintiff's contention. They differ in the facts. In most of the cases the plaintiffs therein were performing church duties clearly beneficial to the church. In another instance plaintiff was a teacher at the invitation of the church authorities and in the case of Kalinowski v. Young Women's Christian Assn., supra, plaintiff was a worker for the defendant. In the case of Manning v. Noa, 345 Mich. 130, 76 N.W.2d 75, 77 A.L.R.2d 955, cited by plaintiff, the plaintiff was atttending a bingo game sponsored by the church and had paid an admission price of $1.00. The only issue decided by the court was whether or not it would permit plaintiff to use her own illegal conduct as a foundation of her claim that she was on defendant's premises as an invitee.

While we have shown no real benefit inured to Father Naes, we do not mean to infer that if plaintiff had been attending a spiritual or religious gathering, whether through an implied or express invitation, a benefit would have inured to the invitor, Father Naes. Plaintiff was not attending a spiritual or religious exercise of the parish and we need not rule on such a situation. We mention this situation because plaintiff relies on the case of Weigel v. Reintjes, Mo.App., 154 S.W.2d 412, decided by this court. In that case plaintiff was attending church devotions at the Rock Church in the City of St. Louis and while there was caused to fall and suffered injuries. In the course of the opinion the writer said, "[p]laintiff was an invitee upon the premises of defendant, * * *." (154 S.W.2d l. c. 416). No point was raised by the defendant in that case involving plaintiff's status or her relationship to the defendant. Defendant did not raise a point wherein it was contended that plaintiff was not an invitee. The statement by this court was wholly unnecessary to a decision and, therefore, was pure dicta, which plaintiff concedes. For this and another reason, the case is not controlling in the instant situation. In the Weigel case plaintiff was in the act of entering the church to attend a religious service which presents a different factual situation than is present in the instant case.

Plaintiff's final contention in the area of the present discussion is that it is not necessary to decide if a real benefit inures to Father Naes because he provided a large building that was "semi public" in nature and, therefore, plaintiff had the right to expect the school premises to be safe or that she be warned of any unsafe condition. She asks, in effect, that because of the alleged "semi-public" nature of the building that this constitute an exception to the general rule and cites language in the cases of Paubel v. Hitz, 339 Mo. 274, 96 S.W.2d 369, and Wolfson v. Chelist, Mo., 284 S.W.2d 447, 451, in support of her contention. In the Paubel case the court in discussing the reciprocal legal rights of the possessor of land and one thereon said they are affected, among other factors, by "the legal relationship existing between the parties * * *; and by the nature of the business conducted on (whether of a public or private nature) * * * the premises; and by the object and purpose of the person's presence on the premises; * * *." (96 S.W.2d l. c. 373). Relying on such language and somewhat similar language in the Wolfson case, plaintiff wants to avoid the determination of plaintiff's relationship to the defendant, Father Naes, as a licensee and, regardless of her purpose on the premises and her manner of entry thereon, hold said defendant to the duty that would normally flow to an invitee. Neither of the cases cited support such an exception. The language relied on by plaintiff in the cases cited merely states some of the factors to be considered by the court in determining whether or not plaintiff is an invitee or a licensee. As pointed out by Father Naes, a guest who accepts the use of the premises as a gift accepts the gift as it is and if the guest is there for her own purpose solely, there can be no legitimate basis for engrafting an

exception on the general rule that makes her a bare licensee. In connection with this contention it should be pointed out that it is not in accord with plaintiff's trial theory. As we have said, plaintiff's petition alleged that she was a "business invitee" and she followed the same theory in her instructions to the jury. This contention constitutes a departure from her trial theory.

We rule that plaintiff was not an invitee of Father Naes and was a mere licensee. No claim was made by plaintiff in her petition of wanton, wilful, intentional or active negligence which would permit plaintiff to recover as a licensee; nor is any such claim now asserted, nor does her evidence show any such negligence. Therefore, the trial court erred in overruling Father Naes' after trial motion for judgment.

The findings and ruling we have made as to Father Naes should be made as to Moeller. In her petition plaintiff's theory of recovery against Moeller was that she was on the premises of St. Cecelia's School as a business invitee of Father Naes for the purpose of attending a meeting and in her verdict directing instruction against Moeller she hypothesized facts which, if found by the jury to exist, required it to find that Father Naes owed a duty (as an invitor) to plaintiff to exercise ordinary care to keep the premises in a reasonably safe condition for use. Therefore, having found that the evidence shows plaintiff was a mere licensee and that Father Naes was not charged with the duty imposed on an invitor as an occupier or possessor of property, plaintiff has failed to produce proof necessary to support the verdict directing instruction against Moeller. In this connection it is well to point out that plaintiff has failed to introduce any evidence that she had any dealing or relationship with Moeller. Therefore, Moeller only owed to the plaintiff the same duty owed by an occupier or possessor of land to a licensee.

Plaintiff suggests that we should adopt the position that whether she was a licensee or invitee, she shared the same status as the person who invited her to the school, namely, Father Naes, pointing out that Moeller owed to Father Naes and his employees the duty to exercise ordinary care during the course of its construction work. Plaintiff cites four cases in support of this suggestion. However, a reading of these cases shows that they involve landlord-tenant or contractor-servant situations and, therefore, have no application to the facts in the instant case. She cites no case in point. Plaintiff's theory of recovery in her petition and at the trial in her instruction was that it was through the duty owed her by defendant, Father Naes, that defendant, Moeller, owed her a duty to exercise ordinary care and this was based on a necessary finding by the jury that plaintiff was an invitee and not a licensee. It would also seem that another reason exists why Moeller should have no greater liability than Father Naes and the reason can be found in the statement contained in Restatement of the Law of Torts, § 384, p. 1024, wherein it is said:

"One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to the same liability, and enjoys the same immunity from liability, as though he were the possessor of the land, for bodily harm caused to others within and without the land, while the work is in his charge, by the dangerous character of the structure or other condition."

As will be seen, this rule applies while the contractor is still in charge and control of the work. In this connection we feel that plaintiff has failed to show by her evidence that Moeller had charge and control of the school and especially did she fail to show that the area in which she was injured was uncompleted. Assuming, without so holding, that Moeller still had work to do

in the school, under this rule said defendant is only subject to the same liability as Father Naes and enjoys the same immunity from liability as does Father Naes.

Plaintiff's final contention as to Moeller is that under the facts in evidence it was for the jury to determine whether there had been such an acceptance, either formal or constructive, of said defendant's work as an independent contractor that would relieve said defendant of further responsibility as a contractor. Plaintiff contends the evidence shows that Moeller had not completed all his work under the contract. She points to the existence of the check list of unfinished items and the testimony indicating some of Moeller's men were working in the building. For this reason, she contends that it was for the jury to determine whether there had been a constructive acceptance of the building by Father Naes. Under this theory of recovery she wants the court to ignore her status as a licensee on the school premises.

◼ In connection with this contention urged by plaintiff, "The general rule is that the contractor, after an acceptance of the work by the owner, is not liable to third parties, who have no contractual relations with him, for damages subsequently sustained by reason of his negligence in the performance of his contract duties." Casey v. Wrought Iron Bridge Co. (Hoover), 114 Mo.App. 47, 89 S.W. 330, 1. c. 334; Begley v. Adaber Realty & Investment Company, Mo., 358 S.W.2d 785, 791; Cummings v. Halpin, Mo.App., 27 S.W.2d 718; White v. City of Springfield, 189 Mo.App. 228, 173 S.W. 1090; 65 C.J.S. Negligence § 95, pp. 613, 614. All of the aforesaid cases contain facts that show final or formal acceptance of the work. There seem to be no cases in the State of Missouri that refer to a constructive acceptance of the work such as we seem to have in the instant case. The rationale of the rule is that if the contractor has turned the work over and it has been accepted by the owner or possessor of the property, the contractor

incurs no further liability to third parties by reason of the condition of the work. The responsibility is then shifted to the owner or possessor and there is no longer any privity of contract between the independent contractor and strangers or third parties and, therefore, no further duty on his part as to them.

◼ The rule that acceptance of a contractor's work relieves him of liability to third persons does not mean that there must be a formal acceptance. There may be a constructive acceptance of the work. The rule in this regard is that the acceptance that is required by the owner or possessor of the work of a contractor, in order to relieve the contractor of liability for injuries to third persons after the acceptance, is a practical acceptance after the completion of the work, a formal acceptance not being required. As stated, while we find no cases in Missouri on this rule, there is abundant authority elsewhere. We cite some of the cases. Haynes v. Norfolk Bridge and Construction Co., 126 Neb. 281, 253 N.W. 344; Memphis Asphalt & Paving Co. v. Fleming, 96 Ark. 442, 132 S.W. 222; Donaldson v. Jones, 188 Wash. 46, 61 P.2d 1007; Rengstorf v. Winston Bros. Co., 167 Minn. 290, 208 N.W. 995; Clyde v. Sumerel, S.C., 104 S.E.2d 392; Wilson v. North Central Gas Co., 163 Neb. 664, 80 N.W.2d 685.

In a reading of the aforesaid cases the basis of the principle of law that holds the contractor liable relates to the control or right to control that he has over the premises on which he is working. We think the basis of the rule regarding a contractor's liability can be found in the language used by the court in Wilson v. North Central Gas Co., (80 N.W.2d 1. c. 687): "It was indispensable to any recovery in this case that appellant (plaintiff) show by evidence that appellee (contractor) was at the time of the accident in control of the premises upon which appellant was injured. * * * 'The burden was upon the plaintiff to establish that the contractor

was yet in charge and control of the work at the time of the accident.' " (Parentheses ours).

Charge and control of the work on the premises at the time of the accident must be shown before a recovery may be had by plaintiff. Plaintiff fails to recognize that the burden of establishing that Moeller was yet in charge and control of the work at the time of the accident belongs to her. In her brief she states that Moeller does not attempt to show that there has been a formal acceptance. Of course, the burden is on her to show that there has not been an acceptance and that the contractor is still in control of the premises, particularly the area in which she fell. We think plaintiff has failed to sustain this burden.

It is undisputed that Father Naes had the right to take possession and use of any completed or partially completed portions of the school building notwithstanding the time for completing the entire work of the building of the school and gymnasium may not have expired. Father Naes said the recessed area where plaintiff fell was constructed in conformance with the building contract. It must be remembered that all of the testimony was given in plaintiff's case and was given by plaintiff's witnesses. Father Naes further testified that when the contractor *had finished* with the recessed area of the building, it was his obligation and not that of the contractor to furnish the rubber mat that would be placed in the recessed area. Moeller had no duty or obligation under the building contract to furnish the rubber mat. It is reasonably inferable from Father Naes' testimony that the vestibule and the recessed area had been completed by the contractor. Plaintiff in her testimony was asked: "Q. Now, at the time you had attended this Brownie meeting on November 12th, the new school *was completed and in use*, was it not, the children were attending the new school?" and she answered, "Yes, sir." When asked if the school itself and the entrance way or exit

way where she was leaving the building that day had been fully constructed and in use for a period of some two months, she answered, "Possibly."

It is reasonably inferable from Father Naes' testimony that pursuant to his right under the building contract to take possession of and use any completed or partially completed portion of the structure, that he took possession and control of the school at the beginning of the school season, namely, September 5th, 1959. It was after he had consulted with the building contractor that he gave the "go ahead" for the school to be used by the students. Pursuant thereto the children started to attend the new school in September of 1959 and were so attending for a period of approximately two months prior to plaintiff's fall and injury. While the testimony disclosed the existence of a check list, that is, certain unfinished items, there was nothing in the testimony to show that any of the unfinished items pertained to the vestibule or the recessed area.

Plaintiff has failed to establish that Moeller was still in charge and control of the work and particularly that part of the premises where plaintiff was injured. The evidence is to the contrary. It shows that Father Naes assumed the use, occupancy and control of the school building and ordered the school to be opened and the school had been opened and in use for two months prior to plaintiff's accident and injury. Furthermore, there is no evidence to show that any of the items on the check list pertained to the area way or vestibule in question and, as heretofore pointed out, the responsibility for obtaining the rubber mat was that of Father Naes. This contention is ruled against plaintiff. Of course, as we have pointed out, this contention is contrary to plaintiff's theory of pleading and trial.

The evidence is insufficient to sustain the judgment against Moeller in the trial court. Therefore, the trial court erred

in overruling defendant, Moeller's, after trial motion for judgment.

The judgment against both defendants is reversed and the cause is remanded with directions to the trial court to sustain the after trial motions of both defendants for judgment and to enter judgment for both defendants.

WOLFE, J., and FRANK W. HAYES, Special Judge, concur.